Anne S. Magnelli ISB # 9452
ANDERSON, JULIAN & HULL, LLP
C. W. Moore Plaza
250 South Fifth Street, Suite 700
Post Office Box 7426
Boise, Idaho 83707-7426
Telephone: (208) 344-5800
Facsimile: (208) 344-5510
E-Mail: amagnelli@ajhlaw.com
service@ajhlaw.com

*Attorneys for Defendants Boise School District*
*Fairmont Junior High School, and Chris Ryan*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MICHAEL CHAMPINE, individually and on behalf of his minor daughter, I.J.C.,<br><br>Plaintiff,<br><br>v.<br><br>CHRIS RYAN, an individual, BOISE SCHOOL DISTRICT, DANIEL SKINNER, an individual and DOES I-X, individuals and/or entities of unknown origin,<br><br>Defendants.<br><br>MEG CHAMPINE, individually, and as natural legal guardian for the Minor Child Plaintiff, IJC,<br><br>Plaintiff,<br><br>vs.<br><br>BOISE SCHOOL DISTRICT; FAIRMONT JUNIOR HIGH, and CHRISTOPHER RYAN and DOES I-X, individuals and/or entities of unknown origin,<br><br>Defendants. | Case No. 1:23-CV-00338-DCN<br><br>**REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS BOISE SCHOOL DISTRICT, FAIRMONT JUNIOR HIGH SCHOOL AND CHRIS RYAN'S MOTION FOR RULE 35 EXAMINATION OF PLAINTIFF I.J.C.** |

COME NOW, the above-entitled Defendants, BOISE SCHOOL DISTRICT, FAIRMONT JUNIOR HIGH, and CHRIS RYAN, by and through their counsel of record, Anderson, Julian & Hull, LLP, and hereby submit this Reply Memorandum in Support of *Defendants' Motion for Rule 35 Examination of Plaintiff I.J.C.*

## I. ARGUMENT

The District has demonstrated both the "good cause" and "in controversy" requirements for a Rule 35 examination of Plaintiff I.J.C. Indeed, Plaintiffs' opposition concedes that the District has demonstrated the "in controversy" requirement. Thus, the District's Reply Memorandum will address why the District has demonstrated the "good cause" requirement for a Rule 35 examination of Plaintiff I.J.C. In this respect, Plaintiffs' opposition argues that by having retained their own examining experts to conduct extensive in-person clinical interviews and multi-session neurocognitive testing of I.J.C., they have obviated the need for a defense exam and the District is required to be satisfied with a records review, depositions of Plaintiffs' experts, and the disclosed reports. That is not the law, nor how Rule 35 operates.

### A. The District has shown that "good cause" exists for the Rule 35 Examination of Plaintiff I.J.C.

"Under Rule 35 the party moving for a physical or mental examination must meet two requirements: first, the physical or mental condition of the party must be 'in controversy'; and second, 'good cause' for the examination must be established." *Ragge v. MCA/Universal Studios*, 165 F.R.D. 605, 608 (C.D. Cal. 1995) (citing *Schlagenhauf v. Holder*, 379 U.S. 104, 117–20, 85 S.Ct. 234, 241–43, 13 L.Ed.2d 152 (1964)). Here, Plaintiffs argue in opposition to the District's Motion for F.R.C.P. 35 Examination of Plaintiff I.J.C. that the District cannot meet the required showing of "good cause" because the District has failed to demonstrate that they cannot obtain the requested information through "less intrusive" means. (Pls' Memo. Opp. Defs.' Motion for F.R.C.P. 35 Examination of Plaintiff, ("Opposition") p. 9). Specifically, regarding the "good cause" showing, Plaintiffs' opposition rests on three flawed premises: (1) that good cause is defeated whenever a defendant has equal access to medical records and the ability to

take depositions; (2) that the examination the District proposes is "duplicative" of Dr. Etnyre's evaluation; and (3) that the out-of-circuit cases Plaintiffs cite (primarily *Winstead* and its district court cousins) control here. (Opposition, pp. 4-9). In this case, Plaintiffs have affirmatively placed I.J.C.'s cognitive functioning, memory, processing speed, executive function, and psychological injuries (which Plaintiffs claim are ongoing) at the center of their claims, and Plaintiffs' experts have relied on direct in-person evaluation to form their (arguably outdated) opinions. Good cause exists for the District's psychological expert to conduct a Rule 35 examination of Plaintiff I.J.C.

Good cause may be established through the consideration of the following relevant factors: "the possibility of obtaining desired information by other means, whether plaintiff plans to prove her claim through testimony of expert witnesses, whether the desired materials are relevant, and whether plaintiff is claiming ongoing emotional distress." *Gavin v. Hilton Worldwide, Inc*., 291 F.R.D. 161, 165 (N.D. Cal. 2013) (quoting *Haqq v. Stanford Hosp. and Clinics*, 2007 WL 1593224, *1, 2007 U.S. Dist. LEXIS 43675, *3 (N.D. Cal. June 1, 2007)). In opposition to this point, Plaintiffs argue that "good cause" is absent because the District already has I.J.C.'s treatment records, the CARES psychological assessment, Dr. Etnyre's neurocognitive evaluation, Ms. Whitmore's October 2025 report, and the opportunity to depose Plaintiffs' experts and treatment providers. Those arguments conflate access to Plaintiffs' evidence with the ability to develop a competing, independent evaluation, which is the very purpose of Rule 35.

Establishing the existence and anticipated length of the injuries and damages Plaintiffs claim is uniquely dependent on clinical and neuropsychological findings that, by their nature, require direct in-person observation and standardized testing. Dr. Etnyre's report identifies low average to considerably below average intellectual functioning, memory weakness, processing speed deficits, visual and auditory processing weaknesses, and, most critically, "areas of weakness within her executive function that do not overlap with central auditory processing disorder and are more than a side effect of her seizure medications." (Magnelli Dec. ¶¶ 2, 3, 4)

Dr. Etnyre's own findings concede that I.J.C. has documented, independently caused, pre-existing conditions, while simultaneously attempting to carve out a subset of deficits as attributable to the alleged conduct of the District's employees. That differential causation analysis is at the heart of the damages case, and it cannot be tested through a deposition transcript or a stack of records.

An expert who has not personally examined the Plaintiff cannot administer standardized neuropsychological instruments, cannot conduct behavioral observation during task performance, cannot assess effort and symptom validity using performance validity measures, and cannot independently evaluate current functional status. These are not theoretical concerns; they are core components of any competent neuropsychological evaluation in a litigation context. Deposing Dr. Etnyre allows cross-examination of her methodology, but it does not permit the District's expert, Dr. Melinda Jorgensen, to develop affirmative findings of her own. Without an in-person examination, Dr. Jorgensen will be forced to opine from records alone; an opinion Plaintiff will likely then attack as ethically constrained and methodologically inferior. Rule 35 exists to prevent this structural imbalance.

The existence and extent of Plaintiff I.J.C.'s mental and physical conditions are not just merely relevant; they are the gravamen of Plaintiffs' entire cause of action against the District. Plaintiffs have brought several claims against the District, including negligence, all of which are predicated upon allegations of past and ongoing physical and mental injuries to Plaintiff I.J.C. Such information cannot be obtained through other sources.

Furthermore, Plaintiffs devote substantial space to a line of out-of-circuit district court decisions, principally *Winstead v. Lafayette County Board of County Commissioners*, 315 F.R.D. 612 (N.D. Fla. 2016), for the proposition that good cause is absent whenever a defendant has been given access to records and the ability to depose plaintiff's providers. None of these cases are binding on this Court, and none are factually analogous to this case.

*Winstead* arose in the Title VII employment discrimination context and relied heavily on policy concerns specific to that context, that being the danger of Rule 35 being deployed as a

retaliatory tool against employees alleging gender or sexual orientation discrimination. *Winstead*, 315 F.R.D. at 613. The *Winstead* court was explicit that those policy concerns "counsel[] in favor of granting Rule 35 motions sparingly given the policies underlying Title VII and similar statutes." *Id*. at 617. Those concerns have no relevancy here. This is not an employment discrimination case. It is a case in which Plaintiff seeks damages for severe and permanent neurocognitive and psychological injuries allegedly arising from sexual abuse by a school employee, and Plaintiff has affirmatively retained an expert to conduct in-person neurocognitive testing of I.J.C. to support those damages.

Similarly, the other out-of-circuit cases Plaintiffs cite, *Acosta v. Tenneco Oil Co.*, 913 F.2d 205 (5th Cir.1990*)*, *Melhorn v. New Jersey Transit Rail Operations, Inc.*, 203 F.R.D. 176 (E.D.Pa.2001*)*, *Stewart v. Burlington Northern Railroad Co*., 162 F.R.D. 349 (D. Minn. 1995*)*, *Stanislawski v. Upper River Services, Inc*., 134 F.R.D. 260, 261 (D. Minn. 1991*)*, and *Soudelier v. Tug Nan Services, Inc.*, 116 F.R.D. 429 (E.D. La. 1987), involved situations in which the defendant sought to repeat an examination already conducted by either a plaintiff-aligned examiner or a defendant-aligned examiner, where the plaintiff had submitted only to limited treatment with no independent litigation-driven evaluation, and where the defendant had been allowed access to plaintiff's medical records and had the opportunity to conduct discovery. Besides having no binding effect on this Court, the procedural posture here is the opposite: Plaintiffs retained (several) examining experts; the District has never had any opportunity to conduct their own examination; the evaluation the District proposes is not a precise repeat of any Plaintiff-aligned examiner, and the evaluation the District proposes is not a repeat of any prior defense-side examination, because none has occurred. The good cause standard is satisfied where, as here, the Defendants have had no opportunity to independently examine a Plaintiff who has placed her cognitive and psychological condition centrally at issue and whose own retained experts have done so.

Next, Plaintiffs characterize the District's proposed examination as a "duplicative" effort to "repeat" Dr. Etnyre's testing. (Opposition, pp. 4, 8) That characterization is incorrect for two

reasons. First, an examination is not "duplicative" simply because it covers the same diagnostic domains as Plaintiffs' expert. By that logic, no Rule 35 examination would ever be permissible once a plaintiff had retained an examining expert, a result that would eviscerate the Rule. Independent neuropsychological evaluation by a defense-retained expert is not a repeat of a plaintiff's evaluation; it is the indispensable mechanism by which a defendant tests the reliability of a plaintiff's findings. Test scores from a single administration are not static. Performance varies with examiner, rapport, effort, motivation, and context. Re-administration with appropriate validity measures by an independent examiner is the only scientifically reliable way to assess whether Dr. Etnyre's results accurately reflect I.J.C.'s true functional capacity, and whether the deficits she attributes to the alleged abuse can in fact be differentiated from I.J.C.'s documented pre-existing conditions.

Second, Plaintiffs' "duplicative" argument cuts directly against Plaintiffs' own discovery conduct. If Dr. Etnyre's evaluation was truly sufficient on its own, Plaintiffs would not have separately retained Ms. Whitmore, who herself relied in part on Dr. Etnyre's neurocognitive testing in formulating her psychotherapeutic opinions, and who conducted her own additional remote sessions with I.J.C. Plaintiffs cannot simultaneously argue that the case warrants multiple plaintiff-side evaluations of I.J.C. while insisting that the District is entitled to none. As a result, Dr. Jorgensen's examination is not "duplicative," or a "repeat" examination of Plaintiffs' experts.

Plaintiffs concede I.J.C.'s mental and physical condition is in controversy. Regarding good cause, Plaintiffs retained an examining expert who conducted a lengthy clinical interview and three separate in-person neurocognitive testing sessions of I.J.C., and a second retained expert who relied in part on that evaluation in forming her opinions. Plaintiffs have placed cognitive functioning, memory, processing speed, executive function, and psychological injury at the center of the damages case and presumably intend to ask a jury to award substantial damages on those grounds. The District has not had an opportunity to independently evaluate any of these claimed conditions. The District has demonstrated that the good cause standard is satisfied.

### B. The Rule 35 Examination is not "Unnecessarily Intrusive and Cumulative."

Plaintiffs next argue that requiring I.J.C. to undergo additional examination risks re-traumatization. The District does not lightly dismiss this concern and has taken concrete steps to mitigate and ameliorate this concern. Specifically, the District has (1) agreed not to pursue the examination until after I.J.C. graduated high school in May 2026; and (2) retained a new, female, neuropsychologist, Dr. Melinda Jorgensen, to conduct the examination. (Magnelli Dec. ¶¶ 7-14) The examination is proposed to occur at a professional clinical setting, with standard breaks as well as a lunch break, and contains no physical examination component beyond what is contemplated for psychological assessment.

More fundamentally, the discomfort of an examination, even an examination concerning sensitive subject matters, does not defeat good cause when the Plaintiff has placed those very matters at the center of the damages case and has voluntarily subjected herself to a multi-session, in-person evaluation by her own retained expert. Plaintiff cannot use the sensitivity of the underlying allegations as both a sword (to support a claim for substantial damages) and a shield (to deny the District any opportunity to test those damages independently).

Additionally, while Plaintiffs have already obliged Plaintiff I.J.C. to undergo a mental examination with their expert, Dr. Etnyre, there are several reasons why the District cannot rely on this report as a credible source of desired information. First, this examination and resulting report were not recently obtained. As such, the report does not speak to any *ongoing* emotional distress of Plaintiff I.J.C. The report was also restricted in scope and limited to the provider dictated by Plaintiffs. Without an independent medical examination, the District cannot reasonably obtain testing and evaluation results necessary to defend Plaintiffs' allegations that Plaintiff I.J.C. suffered and continues to suffer emotional and physical harm as a result of Defendants' actions. Plaintiffs, not the Defendants, have the burden of proving their claims. However, this does not mean that the District must sit on its hands and wait for Plaintiffs to produce evidence which would be admissible at trial in order to advance the defense of their position. The District has good cause to challenge unsupported allegations when such allegations

are integral (not merely relevant) to Plaintiffs' cause of action. A Rule 35 examination is also necessary to evaluate the existence and extent of Plaintiffs' underlying disabilities as they pertain to her alleged harm.

**C. Plaintiffs Have Mischaracterized the Nature of the Parent Plaintiffs' Involvement in Plaintiff I.J.C.'s Rule 35 Examination.**

Plaintiffs' opposition argues that the District's proposed "examination" of Michael and Meg Champine was buried in Section C(i)(3) of the memorandum without any corresponding legal or factual argument establishing that either parent's mental or physical condition is "in controversy" or that good cause exists for their examination. Plaintiffs, however, fundamentally mischaracterize what the District proposes. The District is not proposing a full mental examination of Michael or Meg Champine as parties in their own rights. Rather, the District asks for a collateral informant interview of I.J.C.'s parents, directed at Plaintiff I.J.C.'s history and functioning, which is a standard component of a comprehensive pediatric and young adult neuropsychological evaluation when the child or young adult is still in their parents' care. Because the proposed two-hour session is not a mental examination of Michael or Meg Champine, the "in controversy" and "good cause" requirements Plaintiffs invoke simply do not apply. Here, the collateral interview is not a mental examination of the interviewee. It is an information-gathering session directed at the condition of the examinee, that being Plaintiff I.J.C., through a third-party source with unique historical and current knowledge. Plaintiffs' opposition conflates two categorically different things: being examined and being interviewed as a collateral information source. Defendants do not propose that their expert examine Michael and Meg Champine; Defendants propose that they be used as informants to improve the validity and completeness of Dr. Melinda Jorgensen's examination of I.J.C.

**D. Defendants' Proposed Rule 35 Examination is Narrowly Tailored, Limited in Scope, and Limited in Duration, so the Court Should Reject Plaintiffs' Proposed Scope of the Examination.**

Plaintiffs' alternative position is that any examination should be capped at three hours, based on the duration of Ms. Whitmore's three one-hour remote sessions with Plaintiff I.J.C.

Plaintiffs argue that because Whitmore was able to complete her assessment of I.J.C. within that timeframe, Defendants cannot demonstrate a need for an examination exceeding that scope and duration. Plaintiffs compound this argument with a continued appeal to the sensitivity of the underlying allegations and the risk of harm to I.J.C. from additional examination.

Plaintiffs' three-hour cap proposal is built entirely on Ms. Whitmore's evaluation format. Ms. Whitmore is a licensed professional counselor and psychotherapist whose evaluation consisted of three one-hour telephone and Zoom conferences with I.J.C. (Magnelli Dec. ¶ 6, Exhibit A, pp. 3-5) Her role was to assess I.J.C.'s psychological presentation, the dynamics of the described abuse, and the emotional impact of the alleged conduct. However, Ms. Whitmore's role was not to administer standardized neuropsychological instruments, conduct behavioral observation during structured task performance, or assess cognitive functioning across multiple domains. She expressly relied on Dr. Etnyre's neurocognitive testing rather than conducting an independent cognitive assessment of her own.

The District's expert, Dr. Jorgensen, is a licensed clinical neuropsychologist whose proposed examination is directed at neuropsychological and cognitive assessment, the same category of work Dr. Etnyre performed. (Magnelli Dec. ¶ 7) Thus, by using Ms. Whitmore's three-hour remote interview as the ceiling for a two-day in-person neuropsychological evaluation, Plaintiffs engage in the functional equivalent of arguing that because a general practitioner spent thirty minutes reviewing lab results, a specialist cannot conduct a multi-hour diagnostic procedure. The comparison should be rejected on that basis alone.

The examination Dr. Jorgensen proposes is a neuropsychological evaluation of Plaintiff I.J.C.'s cognitive and psychological functioning. The correct comparison for scope and duration is therefore Dr. Etnyre's evaluation, which is the only other neuropsychological examination in the record. Dr. Etnyre conducted a lengthy clinical interview with Plaintiff I.J.C., plus three separate evaluation sessions covering academic achievement and neurocognitive testing. That evaluation, taken as a whole, was substantially more extensive in time and scope than three one-hour remote therapy sessions.

Measured against Dr. Etnyre's multi-session format, the District's proposed two-day examination, with sessions running from 10:00 a.m. to 3:00 p.m. with breaks and a lunch break each day, is not excessive. It is designed to be coextensive with the evaluation that Plaintiffs' own retained expert conducted, covering the same diagnostic domains using comparable standardized instruments. Plaintiffs cannot point to Dr. Etnyre's multi-session evaluation as the foundation of the damages case while simultaneously arguing that Defendants must be limited to a fraction of that evaluation's scope and duration.

Plaintiffs' use of "narrowly tailored" implies that the proposed examination is overbroad or directed at matters beyond what Plaintiffs have placed in controversy. A truly "narrowly tailored" Rule 35 examination in this case is precisely what the District has proposed: a two-day evaluation by a qualified female neuropsychologist, conducted at a professional clinical setting, with breaks, no physical examination component, APA-compliant testing protocols, and a written report—limited in scope to the cognitive and psychological domains that are the subject of Plaintiffs' damages claim. There is nothing in the proposed examination that exceeds those boundaries. Plaintiffs' "narrowly tailored" argument is not a request for specificity; it is a disguised attempt to reduce the examination to a duration that would make Dr. Jorgensen's opinions methodologically vulnerable and potentially clinically unreliable—or at least subject to attack on that basis. The Court should therefore reject Plaintiffs' arguments regarding the scope of the proposed Rule 35 examination of the Plaintiff I.J.C.

## II. CONCLUSION

For the foregoing reasons, and those articulated in the District's Memorandum in Support, the District respectfully requests that the Court grant its Motion for Rule 35 Examination of Plaintiff I.J.C. And, if the Motion is granted, as it should be, Defendants submit that fees for bringing the Motion and this Reply should be granted to Defendants. *Manley v. Winsupply Inc.*, 2023 WL 7164564, at *1 (D. Idaho Oct. 30, 2023).

DATED this 30th day of June, 2026.

ANDERSON, JULIAN & HULL LLP

By: /s/ *Anne S. Magnelli*
Anne S. Magnelli, Of the Firm
Attorneys for Defendants Boise School District, Fairmont Jr. High, and Chris Ryan

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of June, 2026, I served a true and correct copy of the foregoing document by delivering the same to each of the following attorneys of record, by the method indicated below, addressed as follows:

| | | |
|---|---|---|
| Raymond D. Powers | | |
| Portia L. Rauer | [ ] | U.S. Mail, postage prepaid |
| POWERS FARLEY, P.C. | [ ] | Hand-Delivered |
| 702 West Idaho Street, Suite 700 | [ ] | Overnight Mail |
| Boise, ID 83702 | [ ] | Facsimile |
| Telephone: (208) 577-5100 | [ ] | E-mail |
| E-mails: contact@powersfarley.com | [X] | ECF |
| rdp@powersfarley.com | | |
| plr@powersfarley.com | | |
| *Attorneys for Plaintiff Michael Champine and I.J.C.* | | |

| | | |
|---|---|---|
| Eric S. Rossman | [ ] | U.S. Mail, postage prepaid |
| ROSSMAN LAW GROUP | [ ] | Hand-Delivered |
| 350 N. 9th St., Ste. 500 | [ ] | Overnight Mail |
| Boise, Idaho 83702 | [ ] | Facsimile |
| T: (208) 331-2030 | [ ] | E-mail |
| E: erossman@rossmanlaw.com | [X] | ECF |
| *Attorneys for Plaintiff Meg Champine and I.J.C* | | |

| | | |
|---|---|---|
| Andrea J. Rosholt | [ ] | U.S. Mail, postage prepaid |
| ROSHOLT LAW, PLLC | [ ] | Hand-Delivered |
| 210 Murray St., Suite B | [ ] | Overnight Mail |
| Garden City, Idaho 83714 | [ ] | Facsimile |
| T: (208) 901-5198 | [ ] | E-mail |
| E: andrea@rosholtlaw.com | [X] | ECF |
| *Attorneys for Plaintiff Meg Champine and I.J.C.* | | |

| | | |
|---|---|---|
| Bruce J. Castleton | [ ] | U.S. Mail, postage prepaid |
| Castleton Law PLLC | [ ] | Hand-Delivered |
| 10400 Overland Road #238 | [ ] | Overnight Mail |
| Boise, Idaho 83709 | [ ] | Facsimile |
| T: (208) 629-4590 | [ ] | E-mail |
| E; bruce@castletonlegal.com | [**X**] | ECF |
| *Attorney for Defendant Daniel Skinner* | | |

/s/ *Anne S. Magnelli*
Anne Sullivan Magnelli